UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-20229-CIV-O'SULLIVAN

[CONSENT]

RAFAEL ALFREDO CAMBAR ESPINAL,
ALVARO JAVIER SANCHEZ
CONSUEGRA, ROBERTO SANTIAGO
REYMUNDO, PEDRO GARCIA JACINTO,
WILLIAM ULISES GONZALEZ PICADO
a/k/a NESTOR HERRERA, GERMAN
CAMBAR ESPINAL and MARON ALBERTO
RODRIGUEZ CAMBAR,

                    Plaintiffs,

vs.

BRAVE BUILDERS CORP., SILTEK
GROUP INC., VICTOR LAVASTIDA
and SANDRA DEL CARMEN MORALES,

                    Defendants.

_____/

## ORDER

THIS MATTER is before the Court on the Defendant Siltek Group, Inc.'s Motion

for Summary Judgment and Memorandum of Law (DE# 61, 11/20/14) and the Plaintiffs'

Motion for Summary Judgment (DE# 62, 11/20/14).

## BACKGROUND

On January 30, 2014, the plaintiffs filed their First Amended Complaint under 29

U.S.C. 201-206 Overtime and Minium Wage Violations (DE# 5, 1/30/14) (hereinafter

"Amended Complaint"). The plaintiffs alleged the following causes of action against

defendant Siltek Group, Inc. (hereinafter "Siltek"):[1] federal overtime violation (Count I),

_____

[1] Siltek is the only remaining defendant in this case.

federal minimum wage violation (Count II). Id.

On November 20, 2014, the parties filed their cross-motions for summary judgment. See Defendant Siltek Group, Inc.'s Motion for Summary Judgment and Memorandum of Law (DE# 61, 11/20/14); Plaintiffs' Motion for Summary Judgment (DE# 62, 11/20/14). The parties filed their responses on December 8, 2014. See Defendant Siltek Group, Inc.'s Response and Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment (DE# 64, 12/8/14); Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment (DE# 65, 12/8/14). On December 18, 2014, the parties filed their replies. See Defendant Siltek Group, Inc.'s Reply in Support of Its Motion for Summary Judgment (DE# 66, 12/18/14); Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment (DE# 67, 12/18/14). This matter is ripe for adjudication.

## FACTS

**A.    Siltek**

Siltek is a general contracting company which specializes in building apartments and some commercial buildings. See Deposition of Rene Sierra (DE# 62-2 at 5-6, 11/20/14); Declaration of Rene Sierra (DE# 61-2 at ¶1, 11/20/14). Most of its construction projects are build "from scratch" projects and "very few" are renovation projects. See Deposition of Rene Sierra (DE# 62-2 at 6, 11/20/14).

Rene Sierra is the vice president of Siltek. See Deposition of Rene Sierra (DE# 62-2 at 5, 11/20/14). He is responsible for the daily operations and decisions on all of Siltek's projects. Id. at 46. Siltek employs superintendents and assistant

2

superintendents to oversee the projects. See Deposition of Rene Sierra (DE# 62-2 at 6, 13, 11/20/14).[2] The number of superintendent/assistant superintendents assigned to a particular project varies. Id. at 7. In 2013, Siltek employed between eight and ten superintendents and assistant superintendents. See Deposition of Rene Sierra (DE# 62-2 at 6-7, 11/20/14). Siltek also employed an office staff of ten to twelve people. Id. at 7-8.

**B.     The Cutler Bay Project**

In early 2013, Siltek was hired as the general contractor for the Cutler Bay Senior Housing Project (hereinafter "Cutler Bay Project"). See Deposition of Rene Sierra (DE# 62-2 at 8-9, 40, 11/20/14). The Cutler Bay Project required Siltek to construct a four story, 101 unit building "from [the ground] up." Id. at 8; Deposition of Michael Marti (DE# 62-4 at 10, 11/20/14). The facilities where the construction work took place were owned by non-party Cutler Bay Centre Associates, LLC. See Declaration of Rene Sierra (DE# 61-2 at ¶9, 11/20/14).

Michael Marti was Siltek's project manager for the Cutler Bay Project. See Deposition of Michael Marti (DE# 62-4 at 7, 11/20/14). Mr. Marti's duties consisted of maintaining the project schedule. Id. He ensured that Siltek had all the materials needed for the project, that it hired all of the subcontractors and that the subcontractors followed the weekly schedule. Id. Mr. Marti was also responsible for contacting Waste Management to empty the dumpsters used at the job site. Id. at 20.

---

[2] A superintendent is a person from Siltek in charge of the construction site. See Deposition of Rene Sierra (DE# 62-2 at 6, 11/20/14). An assistant superintendent "helps . . . out" the superintendent. Id.

The superintendent for the Cutler Bay Project was Burt Villareal.[3] See Deposition of Rene Sierra (DE# 62-2 at 9, 11/20/14). Mr. Villareal worked on the project for approximately six or seven months. Id. at 10, 21. He "made sure that the work was being done according to plans and spec[ifications], and that [Siltek] w[as] on schedule." Id. at 13. "[Siltek] manage[s] subcontractors to make sure that [Siltek is] moving forward," that "[Siltek is] passing inspections" and that "[Siltek is] managing the construction sites." Id.

## C.    VR Enterprises

Siltek hired numerous subcontractors to perform the work on the Cutler Bay Project including an electrical company[4] and a plumbing company. See Deposition of Rene Sierra (DE# 62-2 at 8-9, 29, 11/20/14).

On or about January 14, 2013, Siltek entered into a subcontract agreement with VR Enterprises Group, Corp. (hereinafter "VR Enterprises"). See Declaration of Rene Sierra (DE# 61-2 at ¶4, 11/20/14); Subcontract Agreement (DE# 61-2 at 6, 11/20/14). VR Enterprises worked on the project from April 2013[5] until it was terminated in August 2013. See Sworn Declaration of Victor Lavastida (DE# 65-3 at ¶3, 12/8/14); Declaration

---

[3] Mr. Villareal's legal name is "Humberto Villareal." See Deposition of Humberto Villareal (DE# 62-3 at 4, 11/20/14). In one instance, Mr. Sierra referred to this individual as "Burt Stein." See Deposition of Rene Sierra (DE# 62-2 at 10, 11/20/14). This appears to be a mistake as there was no other mention of a "Burt Stein" in Mr. Sierra's deposition transcript or anywhere else in this record.

[4] The electrical company hired for the Cutler Bay Project was owned by Mr. Sierra. See Deposition of Rene Sierra (DE# 62-2 at 29-30, 11/20/14).

[5] According to Mr. Sierra's declaration, VR Enterprises began work on the Cutler Bay Project in approximately February 2013. See Declaration of Rene Sierra (DE# 61-2 at ¶5, 11/20/14)

4

of Rene Sierra (DE# 61-2 at ¶5, 11/20/14).

Siltek hired VR Enterprises to perform the structural work, meaning to create "[t]he concrete, the rebars, the structural walls" of the building. See Deposition of Rene Sierra (DE# 62-2 at 11, 11/20/14). This work included "forming, placing the reinforcing steel [and] pour[ing] the concrete." Id. This work is sometimes considered carpentry work. Id. VR Enterprises "suppl[ied] carpenters to [work] on the project." Sworn Declaration of Victor Lavastida (DE# 65-3 at ¶4, 12/8/14). Plaintiffs Rafael Alfredo Cambar Espinal, Alvaro Javier Sanchez Consuegra, Roberto Santiago Reymundo, Pedro Garcia Jacinto and William Ulises Gonzalez Picada a/k/a Nestor Herrera all worked on the Cutler Bay Project. Id. at ¶8.[6]

The subcontract between Siltek and VR Enterprises required that VR Enterprises "furnish all labor, supervision, services, material, equipment, tools, insurance, permits, all applicable taxes and all other items necessary to perform the concrete shell work" for the Cutler Bay Project. See Subcontract Agreement (DE# 61-2 at 6, 11/20/14). The subcontract further required that VR Enterprises "provide full-time, competent supervision on [the] project" and stated that VR Enterprises "[a]ssume[d] all risks and liability for damage or loss to all materials, tools or equipment incorporated in the work and whlo [sic] belong to him [sic] or are under his [sic] control." Subcontract (DE# 61-2 at 6-7, 11/20/14).

---

[6] There is no record evidence that plaintiffs German Cambar Espinal and Marion Alberto Rodriguez Cambar worked on the Cutler Bay Project. As noted in Siltek's summary judgment motion, these two plaintiffs "were excluded from Count I and II of the First Amended Complaint and thus do not assert any claims against Siltek . . . ." Defendant Siltek Group, Inc.'s Motion for Summary Judgment and Memorandum of Law (DE# 61 at 1 n.1, 11/20/14).

The subcontract specified how much money VR Enterprises would be paid for its work on the project. See Deposition of Rene Sierra (DE# 62-2 at 12, 11/20/14). It was priced per square feet of elevated concrete slab, linear feet of concrete beams, square feet of concrete shear walls, square feet of "concrete slab on grade," per concrete column and per "ton of steel installed in cast in place concrete." Subcontract (DE# 61-2 at 6, 11/20/14). It did not provide an hourly rate for VR Enterprises' carpenters, handymen and other workers and did not otherwise specify the salaries or rates of pay for VR Enterprises' workers. See Deposition of Rene Sierra (DE# 62-2 at 13, 18, 11/20/14).

## D.   Materials and Tools for the Cutler Bay Project

Notwithstanding the terms of the subcontract, Siltek purchased all the materials – the cement, the rebars and the lumber – used by VR Enterprises for the project. See Deposition of Rene Sierra (DE# 62-2 at 12, 11/20/14); Deposition of Michael Marti (DE# 62-4 at 18, 11/20/14).[7] The materials were the bulk of the cost of the Cutler Bay Project and exceeded a million dollars. See Deposition of Michael Marti (DE# 62-4 at 16, 11/20/14).

Siltek's superintendent, Mr. Villareal, was responsible for ordering the materials for the project and for receiving them at the job site. See Deposition of Humberto

---

[7] Mr. Sierra testified that "[Siltek] provided all the materials for all [of its] projects." Deposition of Rene Sierra (DE# 62-2 at 43-44, 11/20/14). However, Mr. Marti testified that the plumbers provided their own fixtures and the electricians brought "the lights and stuff like that." Deposition of Michael Marti (DE# 62-4 at 16, 11/20/14).

Villareal (DE# 62-3 at 10, 11/20/14).[8] Mr. Villareal ordered these materials for the subcontractors' use in the project. Id. He had to obtain approval or re-approval from Mr. Marti, Siltek's project manager, when ordering these materials. See Deposition of Humberto Villareal (DE# 62-3 at 30-31, 11/20/14).

If the subcontractors needed to remove water to continue their work, Mr. Villareal would order the water pump. See Deposition of Humberto Villareal (DE# 62-3 at 30-31, 11/20/14). Siltek also provided a forklift and hired a third party company to operate a crane at the Cutler Bay Project job site. See Deposition of Michael Marti (DE# 62-4 at 9-10, 41,  11/20/14).[9] VR Enterprises' workers used both the forklift and the crane while working on the project. Id. at 10, 40.

Mr. Villareal did not order tools for the subcontractors and Siltek never provided tools to VR Enterprises' workers. See Deposition of Humberto Villareal (DE# 62-3 at 31, 38, 11/20/14); see also Deposition of Michael Marti (DE# 62-4 at 9, 42, 11/20/14) (stating that no tools were purchased or provided to the subcontractor's workers for the Cutler Bay Project).

---

[8] According to Mr. Marti, he was the one who actually purchased the materials for the project and Mr. Villareal would set the dates for the material to be delivered to the job site. See Deposition of Michael Marti (DE# 62-4 at 8, 11/20/14). Mr. Villareal "purchased [material for] the whole project and then he would ask [Mr. Marti] for what he would need on a weekly basis or monthly basis. See Deposition of Michael Marti (DE# 62-4 at 8-9, 11/20/14).

[9] Mr. Sierra's declaration states that other than the crane, "Siltek did not provide any equipment to VR Enterprises." See Declaration of Rene Sierra (DE# 61-2 at ¶4, 11/20/14). However, the record evidence shows that Siltek provided VR Enterprises' workers with a forklift. See Deposition of Michael Marti (DE# 62-4 at 9-10, 40-41, 11/20/14).

**E.     Supervision of the Work on the Cutler Bay Project**

Mr. Villareal instructed the subcontractors on which parts of the building to work

on. See Deposition of Rene Sierra (DE# 62-2 at 14, 11/20/14). He was also responsible

for "check[ing] out layouts for the construction," meaning that "when subcontractors

[we]re laying something out for them to build, [Mr. Villareal] would check the [blue]prints

to make sure they were doing it the right way." Deposition of Humberto Villareal (DE#

62-3 at 10, 12, 11/20/14). For instance, if Mr. Villareal observed VR Enterprises'

workers placing a beam in the wrong place, he would notify Victor Lavastida, the owner

and project manager of VR Enterprises. Id. at 42-43;[10] Deposition of Michael Marti (DE#

62-4 at 12, 11/20/14) (stating that Mr. Lavastida was the owner and project manager of

VR Enterprises). Mr. Villareal would not tell the workers to stop what they were doing.

Id. at 42-43

According to Mr. Villareal, it was Siltek's responsibility to ensure that the work

performed by the subcontractors was satisfactory. See Deposition of Humberto Villareal

(DE# 62-3 at 20, 11/20/14). Mr. Villareal could advise a subcontractor's representative

on how to perform a specific task. Id. at 40, 41. However, he "never told them how to do

their job." Id. at 40.

**F.     Project Meetings**

When Siltek worked on a project, it provided its client (the owner of the project)

with an estimate of how long the project would take to complete. See Deposition of

---

[10] According to Mr. Lavastida, "[Mr.] Villareal . . . would direct and control the
work of the carpenters supplied by VR Enterprises." Sworn Declaration of Victor
Lavastida (DE# 65-3 at ¶5, 12/8/14). However, he provides no specific details on how
Mr. Villareal would "direct and control the work" of VR Enterprises' carpenters.

Rene Sierra (DE# 62-2 at 34, 11/20/14). That estimate was part of the contract. Id. Siltek then gave a "smaller schedule" to its subcontractors and "[t]hat schedule [was] reviewed on a weekly basis on site" to account for changes. Id.

Siltek held weekly meetings with all of its subcontractors. See Deposition of Rene Sierra (DE# 62-2 at 14, 11/20/14). These meetings were held "on-site" and were attended by the relevant subcontractors' superintendents or project managers. Id. at 38. Mr. Lavastida would usually attend these meetings on behalf of VR Enterprises. Id. at 35-36. None of VR Enterprises' workers attended these meetings. See Deposition of Humberto Villareal (DE# 62-3 at 36, 11/20/14); see also Deposition of Michael Marti (DE# 62-4 at 35, 11/20/14) (stating that no workers attended these meetings, only the subcontractors' supervisors).

Siltek would "control" the meetings and "the superintendent r[an] the meetings." See Deposition of Rene Sierra (DE# 62-2 at 14-15, 11/20/14).[11] During these meetings, Siltek would "instruct the flow of the work." Id. at 14. OSHA rules and regulations were also discussed in all of Siltek's meetings. See Deposition of Michael Marti (DE# 62-4 at 28, 11/20/14). The subcontractors' workers or their employment policies were never discussed at these meetings. See Deposition of Humberto Villareal (DE# 62-3 at 36, 11/20/14).

**G.    Work Schedule**

Siltek determined the days of the week the subcontractors could work at the job

---

[11] Mr. Villareal testified that it was the project manager or the owners of Siltek who were in charge of the meetings. See Deposition of Humberto Villareal (DE# 62-3 at 21, 11/20/14).

site. See Deposition of Humberto Villareal (DE# 62-3 at 29, 11/20/14). Construction

work on the Cutler Bay Project took place Mondays through Saturdays. See Deposition

of Rene Sierra (DE# 62-2 at 21, 11/20/14). Saturdays were either a half day or a full

work day. Id.[12] Siltek always had someone supervising the project while a subcontractor

was performing work at the job site. See Deposition of Michael Marti (DE# 62-4 at 15-

16, 11/20/14). The subcontractors could not perform work at the job site without Mr.

Villareal or Mr. Marti present. Id. at 15.

Mr. Villareal was at the job site from 7:00 a.m. to 3:00 p.m., five days a week and

sometimes six days a week. See Deposition of Humberto Villareal (DE# 62-3 at 13,

11/20/14). Mr. Lavastida (VR Enterprises' project manager) was not at the Cutler Bay

Project job site every day. Id. at 19. "[H]e would come and go." Id.[13]

## H.      Number of Workers at the Job Site

VR Enterprises would determine the number of workers it needed and the

number of hours those workers would work at the job site. See Deposition of Rene

Sierra (DE# 62-2 at 31-36, 11/20/14). As Mr. Villareal explained:

[The subcontractors] were working, but they're supposed to perform, you

---

[12] Mr. Villareal testified that he worked on Saturdays only some of the time and
on those days, he worked the entire day. See Deposition of Humberto Villareal (DE#
62-3 at 13, 11/20/14). According to Mr. Marti, when the project started to get behind
schedule, they started working Mondays through Saturdays. See Deposition of Michael
Marti (DE# 62-4 at 15, 11/20/14).

[13] Mr. Marti testified that Mr. Lavastida was at the job site every time Mr. Marti
was there and most of the time when Mr. Marti spoke to Mr. Villareal on the telephone.
See Deposition of Michael Marti (DE# 62-4 at 13, 11/20/14). However, he testified that
Mr. Villareal's testimony should be relied upon to determine how often Mr. Lavastida
was at the job site because Mr. Villareal was at the job site on a daily basis and Mr.
Marti was not. Id.

know, whether they had twenty men one day, fifteen another, five another, I would just report how many people they had there because from the sign[-]in sheet pretty much and **it was not up to me to tell them how many men they have to have.**

See Deposition of Humberto Villareal (DE# 62-3 at 20, 11/20/14) (emphasis added).

During the Cutler Bay Project:

> Siltek did not apportion tasks to individuals, did not specify the number of workers assigned or hired to the Project, did not get involved in [Mr.] Lavastida/VR Enterprises' management structure, and did not get involved with the specifics of how [the p]laintiffs performed the work. At all times, [the p]laintiffs were directly supervised by a representative of VR Enterprises.

Declaration of Rene Sierra (DE# 61-2 at ¶12, 11/20/14).

VR Enterprises did not need preapproval from Siltek regarding the number of workers it wanted to bring to the job site. See Deposition of Michael Marti (DE# 62-4 at 26, 11/20/14). However, if VR Enterprises was not bringing enough workers, Siltek would tell it to bring in more workers. Id. at 26-27. During the Cutler Bay Project, Siltek told VR Enterprises that VR Enterprises needed to bring in extra workers to ensure they stayed on schedule. Id. at 13.[14] This conversation took place two to three months

---

[14] During his deposition, Mr. Marti testified as follows:

Q.   Therefore, you set up a certain schedule with the subcontractors that they needed to complete tasks by specific target dates?

A.   That's correct.

Q.   And based on coming close to those target dates and those projects not being completed, **you would have to tell Victor [Lavastida] to have more people come in so that the project would move along quicker?**

A.   **That's correct.**

before VR Enterprises was terminated from the project. Id. at 14.

**I.      Hiring and Firing of VR Enterprises' Workers**

Siltek did not tell VR Enterprises which specific workers to hire. See Deposition of Michael Marti (DE# 62-4 at 41, 11/20/14). It did not conduct any background checks on its subcontractors' workers. See Deposition of Rene Sierra (DE# 62-2 at 20, 11/20/14). If an employee of VR Enterprises was "slacking off or not performing work properly," Mr. Villareal "would go to Victor [Lavastida] or the responsible party at [the] site to tell him that they weren't even doing the work correctly or they were slacking off." Id. at 20-21. Mr. Villareal "would[ not] take it upon [himself] to deal with [VR Enterprises'] employees." Id. at 20. Mr. Villareal never reprimanded any of the subcontractors' workers. See Deposition of Humberto Villareal (DE# 62-3 at 19, 37, 11/20/14).[15]

Nonetheless, Siltek had the right to fire a subcontractor's employee, "[e]specially if it deal[t] with safety." See Deposition of Rene Sierra (DE# 62-2 at 42-43, 11/20/14);[16]

---

See Deposition of Michael Marti (DE# 62-4 at 14, 11/20/14) (emphasis added).

[15] The only person from VR Enterprises that Mr. Villareal directly "dealt with" was Victor Lavastida. See Deposition of Humberto Villareal (DE# 62-3 at 22, 11/20/14).  Mr. Villareal explained: "Whenever I go to somebody, I go straight to whatever [sic] who's there in charge. And if there's nobody's in charge, then I wait for somebody in charge to get there." Id.

[16] Mr. Sierra's declaration states that "Siltek had no right, directly or indirectly, to hire, fire, or modify [the p]laintiffs' employment conditions. Siltek reserved the right to ask VR Enterprises to remove a worker from the Project site for non-compliance with safety rules, but Siltek had no right to fire or modify Plaintiffs' employment with VR Enterprises." Declaration of Rene Sierra (DE# 61-2 at ¶8, 11/20/14); see also Subcontract (DE# 61-2 at 7, 11/20/14) (stating that "[Siltek] may require [VR Enterprises] to stop work and remove employees for failing to comply with safety requirements."). However, Mr. Sierra testified in his deposition that Siltek retained the

12

Deposition of Michael Marti (DE# 62-4 at 45-46, 11/20/14) (stating that Siltek could fire a worker from a job site if there was probable cause such as a safety violation or if the worker showed up to work intoxicated, but not fire the worker from their employment with the subcontractor).

The superintendent was responsible for ensuring that safety protocols were followed by all the workers at the job site. See Deposition of Rene Sierra (DE# 62-2 at 43, 11/20/14); Deposition of Humberto Villareal (DE# 62-3 at 27, 11/20/14). For instance, if he saw a worker without a hard hat, he would tell that worker to wear one. See Deposition of Rene Sierra (DE# 62-2 at 43, 11/20/14). Mr. Villareal would also ensure that workers who were working "up high" were "tied off" to prevent injury in the event of a fall. See Deposition of Humberto Villareal (DE# 62-3 at 26, 11/20/14). Additionally, every subcontractor working at the job site was expected to have its own safety procedures.

During his deposition, Mr. Sierra explained that: "If [they] ha[d] an employee, which ever employee it [wa]s, if there[ wa]s an employee [who wa]s not following the safety rules and he [would not] listen to make sure that he follow[ed] the safety rule, he would be removed from the site immediately." See Deposition of Rene Sierra (DE# 62-2 at 43, 11/20/14).

If a worker arrived at the job site without proper attire, he would be sent home. See Deposition of Michael Marti (DE# 62-4 at 28-29, 11/20/14). Proper attire at the job site was an OSHA requirement. Id. at 38. Anyone who was not following OSHA rules

---

right to fire a subcontractor's employee. See Deposition of Rene Sierra (DE# 62-2 at 42-43, 11/20/14).

and regulations would be sent home. Id. at 39. If Mr. Marti encountered this problem at a job site, he would "automatically come up to that person," ask him to leave the job site and then raise the issue with that person's supervisor. Id. at 39.

**J.      Sign-in Sheets**

It was possible for the different subcontractors on the Cutler Bay Project to work different days of the week or different hours of the day depending on the state of the project. See Deposition of Rene Sierra (DE# 62-2 at 31-32, 11/20/14). A sign-in sheet was posted on a wall, towards the front of the job site. See Deposition of Humberto Villareal (DE# 62-3 at 14, 11/20/14). The workers were required to write their name, the company they worked for and the date on the sign-in sheet. See Deposition of Michael Marti (DE# 62-4 at 21, 11/20/14). They were also required to record the time they arrived at the job site and the time they left the job site. Id. at 21, 29.[17]

The purpose of the sign-in sheet was to ensure that all of the workers at the job site were accounted for in the event of an accident or building collapse. See Deposition of Humberto Villareal (DE# 62-3 at 37, 11/20/14); Declaration of Rene Sierra (DE# 61-2

---

[17] During his deposition, Mr. Sierra testified that Siltek did not keep any records indicating what days of the week work was performed on the Cutler Bay Project or how many hours the workers were at the job site. See Deposition of Rene Sierra (DE# 62-2 at 21, 11/20/14). However, this testimony was partially contradicted by Mr. Villareal's deposition testimony. See Deposition of Humberto Villareal (DE# 62-3 at 14, 17, 23, 11/20/14). Mr. Villareal testified that Siltek did keep sign-in sheets reflecting the name and date a particular subcontractor was at the job site, but no time records were kept indicating the amount of time spent by that subcontractor on a given day. Id. Mr. Villareal's testimony, in turn, was partially contradicted by Mr. Marti who testified that the sign-in sheets did indicate the time a worker arrived and left the job site. See Deposition of Michael Marti (DE# 62-4 at 21, 29, 11/20/14).

at ¶11, 11/20/14).[18] It was not to keep track of the time the plaintiffs spent on the project. Declaration of Rene Sierra (DE# 61-2 at ¶11, 11/20/14).

All of the paperwork was picked up by Mr. Marti during monthly meetings and taken back to Siltek's office. <u>See</u> Deposition of Humberto Villareal (DE# 62-3 at 15-16, 11/20/14). The sign-in sheets were given to Martha McCaul, Siltek's comptroller.[19] <u>See</u> Deposition of Michael Marti (DE# 62-4 at 22, 11/20/14). Siltek never asked Mr. Villareal to verify the hours worked by its subcontractors. <u>See</u> Deposition of Humberto Villareal (DE# 62-3 at 16, 11/20/14). Siltek did not maintain any other records, including employment records, for the workers of its subcontractors on the Cutler Bay Project.[20] <u>Id.</u>; <u>see also</u> Declaration of Rene Sierra (DE# 61-2 at ¶14, 11/20/14).

By contrast, all of Siltek's employees, including Mr. Villareal, would fill out a time sheet which they would sign and submit to Siltek's office. <u>See</u> Deposition of Rene Sierra (DE# 62-2 at 22, 11/20/14). These time sheets reflected the days and hours worked by Siltek's employees. <u>Id.</u> at 22-23. Siltek maintained records of those time sheets. <u>Id.</u> at 22.

---

[18] Mr. Marti testified that he used the sign-in sheets to ensure that the subcontractors were showing up to work and performing their jobs. <u>See</u> Deposition of Michael Marti (DE# 62-4 at 30, 11/20/14). He also used the sign-in sheets to determine which subcontracts were at the job site on a given day. <u>Id.</u>

[19] Ms. McCaul's job duties included payroll, accounting and human resources. <u>See</u> Deposition of Michael Marti (DE# 62-4 at 22, 11/20/14).

[20] Siltek kept records of its subcontractors' employees only on "federal jobs," because it was required to do so by law. <u>See</u> Deposition of Rene Sierra (DE# 62-2 at 24, 11/20/14). The Cutler Bay Project was not a "federal job." <u>Id.</u>

**K.**     **VR Enterprises' Invoices and Payment**

VR Enterprises would submit invoices to Siltek and would get paid on either a weekly or biweekly basis for the work it had completed. <u>See</u> Deposition of Rene Sierra (DE# 62-2 at 15, 11/20/14).[21] "[Mr.] Lavastida and VR Enterprises never submitted to Siltek any payrolls, timesheets, or other documents pertaining to VR Enterprises' employee wages." Declaration of Rene Sierra (DE# 61-2 at ¶7, 11/20/14).

The invoices reflected the work performed by VR Enterprises. <u>See</u> Deposition of Rene Sierra (DE# 62-2 at 36, 11/20/14). These invoices would be reviewed by Mr. Villareal before they were submitted to Siltek's accounting department. <u>Id.</u> at 16. Mr. Villareal would check the invoice to "determine whether the invoice charge was correct [and] in accordance [with] the work that was completed on site." <u>Id.</u> Mr. Marti would only review VR Enterprises' invoices "whenever something[ was] questionable." <u>See</u> Deposition of Michael Marti (DE# 62-4 at 31, 11/20/14).

Mr. Villareal and Mr. Marti would have to sign off on VR Enterprises' invoices. <u>See</u> Deposition of Rene Sierra (DE# 62-2 at 16, 11/20/14).[22] There were times when Mr. Villareal did not sign off on an invoice because he believed there was something wrong with the invoice. <u>Id.</u> at 18.

Siltek would pay the invoices by making a check out to the subcontractors. <u>See</u> Deposition of Rene Sierra (DE# 62-2 at 18-19, 11/20/14). Siltek's checks were always

---

[21] According to Mr. Lavastida, the invoices were submitted on a weekly basis. <u>See</u> Sworn Declaration of Victor Lavastida (DE# 65-3 at ¶6, 12/8/14).

[22] Mr. Marti was incorrectly identified as "Mark Mardi" in Mr. Sierra's deposition transcript. <u>See</u> Deposition of Rene Sierra (DE# 62-2 at 16-17, 11/20/14).

signed by Mr. Sierra. Id. at 40. Siltek would not issue checks to the workers of the subcontractors "unless the subcontractors were not paying the employees and [Siltek] found out about it when [it] w[as] making checks. . . ." Id. at 19. This did not occur on the Cutler Bay Project. Id.[23] According to Mr. Sierra, none of the subcontractors' workers ever complained to Siltek that they were not paid for certain hours. Id. at 40. However, Mr. Marti received "a couple of calls" from workers who had not received payment for work performed on the Cutler Bay Project. See Deposition of Michael Marti (DE# 62-4 at 32-33, 11/20/14). Mr. Marti referred those complaints to Siltek's comptroller. Id. at 33. "Siltek did not prepare payroll or pay [the p]laintiffs any wages." Declaration of Rene Sierra (DE# 61-2 at ¶7, 11/20/14).

## L.     VR Enterprises' Termination from the Cutler Bay Project

Siltek "carr[ies] insurance for the business that covers the projects" including general liability insurance and worker's compensation insurance. See Deposition of Rene Sierra (DE# 62-2 at 27, 11/20/14). The types of insurance Siltek carries depend on the requirements of the general contract. Id. Siltek requires that its subcontracts carry a certain amount of worker's compensation insurance and liability insurance and that Siltek be named on those insurance policies. Id. at 28. Mr. Sierra believed that if Siltek allowed a subcontractor to work without insurance on one of its projects Siltek's insurance would cover a subcontractor's workers. Id. at 28.

In August 2013, Siltek learned that VR Enterprises' worker's compensation

---

[23] Mr. Sierra explained that the only time Siltek would know how much money a subcontractor's employee was being paid was on "Davis-Beacon jobs." See Deposition of Rene Sierra (DE# 62-2 at 19, 11/20/14). Mr. Sierra appears to be referring to the Davis-Beacon Act, 40 U.S.C. § 276, et seq., which concerns government contracts.

insurance had lapsed and terminated VR Enterprises from the Cutler Bay Project. <u>See</u>

Declaration of Rene Sierra (DE# 61-2 at ¶5, 11/20/14).[24] After terminating VR

Enterprises from the Cutler Bay Project, Siltek hired another subcontractor to complete

the work started by VR Enterprises. <u>See</u> Deposition of Rene Sierra (DE# 62-2 at 25, 32-

33, 11/20/14). "Siltek paid VR Enterprises in full for all work that VR Enterprises had

completed up to the termination of its subcontract . . . ." Declaration of Rene Sierra

(DE# 61-2 at ¶14, 11/20/14).

## <u>STANDARD OF REVIEW</u>

The Court, in reviewing a motion for summary judgment, is guided by the

standard set forth in Federal Rule of Civil Procedure 56(a), which states, in relevant

part, as follows:

> A party may move for summary judgment, identifying each claim or
> defense – or the part of each claim or defense – on which summary
> judgment is sought. The court shall grant summary judgment if the movant
> shows that there is no genuine dispute as to any material fact and the
> movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

The moving party bears the burden of meeting this exacting standard. <u>Celotex</u>

<u>Corp. v. Catrett</u>, 477 U.S. 317, 322-323 (1986); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S.

144, 157 (1970). That is, "[t]he moving party bears the initial responsibility of informing

the . . . court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

---

[24] According to Mr. Marti, VR Enterprises was terminated because it was not
maintaining the schedule to complete the job. <u>See</u> Deposition of Michael Marti (DE# 62-
4 at 14, 11/20/14).

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting Celotex, 477 U.S. at 323) (internal quotation marks omitted).

In assessing whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the non-moving party. Batey v. Stone, 24 F.3d 1330, 1333 (11th Cir. 1994). Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain. Reich v. John Alden Life Ins. Co., 126 F.3d 1 (1st Cir. 1997).  If the record presents factual issues, the Court must deny the motion and proceed to trial. Adickes, 398 U.S. at 157; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Despite these presumptions in favor of the non-moving party, the Court must be mindful of the purpose of Rule 56 which is to eliminate the needless delay and expense to the parties and to the Court occasioned by an unnecessary trial. Celotex, 477 U.S. at 322-323. Consequently, the non-moving party cannot merely rest upon his or her bare assertions, conclusory allegations, surmises or conjectures.  Id.  As the Supreme Court noted in Celotex:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against the party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Id. at 322-323. Thus, the mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient. There must be evidence on which the jury could

reasonably find for the non-movant. <u>Anderson</u>, 477 U.S. at 251; <u>Matsuchita Elec. Indus.</u>

<u>Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986). "When evaluating cross-

motions for summary judgment, the Court analyzes each individual motion on its own

merits and thus views the facts on each motion in the light most favorable to the

respective nonmovant." <u>Adega v. State Farm Fire & Cas. Ins. Co.</u>, No. 07-20696, 2009

WL 3387689, at *3 (S.D. Fla. Oct.16, 2009).

<u>ANALYSIS</u>

**A.      Defendant Siltek Group, Inc.'s Motion for Summary Judgment and Memorandum of Law (DE# 61)**

Siltek moves for summary judgment on the issue of whether it was the plaintiffs'

joint-employer under the FLSA. The FLSA defines an "employer" as "any person acting

directly or indirectly in the interest of an employer in relation to an employee" and

recognizes that a plaintiff may have more than one employer. <u>See</u> 29 U.S.C. § 203(d);

<u>see</u> <u>also</u> 29 C.F.R. § 791.2(a) (stating that "[a] single individual may stand in the relation

of an employee to two or more employers at the same time under the [FLSA]"). As the

Eleventh Circuit has noted:

> whether a party qualifies as a joint employer for liability purposes depends
> on whether "as a matter of economic reality, the individual is dependent
> on the entity." <u>Antenor v. D & S Farms</u>, 88 F.3d 925, 929 (11th Cir. 1996).
> Under the FLSA "[a] determination of whether the employment by the
> employers is to be considered joint employment or separate and distinct
> employment for purposes of the act depends upon all the facts in the
> particular case." 29 C.F.R. § 791.2. This case-by-case inquiry turns on no
> formula, but the court will consider factors such as control, supervision,
> right to hire and fire, ownership of work facilities, investment, and pay-roll
> decisions. <u>Antenor</u>, 88 F.3d at 932-37.

<u>Cornell v. CF Ctr., LLC</u>, 410 F. App'x 265, 268 (11th Cir. 2011) (<u>per</u> <u>curiam</u>) (alterations

20

in original).

The Eleventh Circuit employs an eight-factor test[25] to determine whether a joint-employment relationship exists. Layton v. DHL Express (USA), Inc., 686 F.3d 1172, 1176 (11th Cir. 2012). These eight factors are the following: (1) the nature and degree of control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the right, directly or indirectly, to hire, fire, or modify the workers' employment conditions; (4) the power to determine the workers' pay rates or methods of payment; (5) preparation of payroll and the payment of wages; (6) ownership of the facilities where work occurred; (7) performance of a speciality job integral to the business and (8) investment in equipment and facilities. Id.

In applying this eight-factor test, the Court must be cognizant of the following:

First, the question of "joint employment" is not dependent on whether the worker is more economically dependent on one putative employer than on the other, because more than one entity can be an employer. Second, the existence of a joint employment relationship depends on the economic reality of all the circumstances, rather than any one factor. Third, the

---

[25] In analyzing the joint-employer issue, Siltek relies on an eight-factor test used by the Eleventh Circuit in Layton, 686 F.3d at 1176. These are the same eight factors applied by the Eleventh Circuit in an earlier decision, Antenor v. D&S Farms, 88 F.3d 925, 923 (11th Cir. 1996). The plaintiffs cite to a six-factor test employed by this Court in Santelices v. Cable Wiring, 147 F. Supp. 2d 1313, 1319 (S.D. Fla. 2001) (citing Real v. Driscoll Strawberry Assocs., Inc., 603 F.2d 748, 754 (9th Cir. 1979)). The Santelices Court used this six-factor test to distinguish between an independent contractor and an employee. Id. Here, "Siltek has not claimed that [the p]laintiffs were independent contractors. . . ." Defendant Siltek Group, Inc.'s Response and Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment (DE# 64 at 3, 12/8/14). The Santelices opinion did apply the eight-factor test of Antenor to address whether the defendants were joint-employers. Santelices, 147 F. Supp. 2d at 1324. However, that is not the portion of the Santelices opinion the plaintiffs cite to in their summary judgment motion and in their response in opposition to Siltek's summary judgment motion. Because Layton is a controlling, Eleventh Circuit decision, the undersigned will rely on the eight factors used in that case.

factors are used because they are indicators of economic dependence. Fourth, the joint employment relationship is not determined by a mathematical formula – the court must view each of the factors qualitatively to assess the evidence of economic dependence. Fifth, the inquiry must focus on the issue of economic dependency, not common-law concepts of employment. Sixth, the FLSA is a remedial statute, and courts must construe it broadly.

Jeanneret v. Aron's E. Coast Towing, Inc., No. 01-8001-CIV, 2002 WL 32114470, at *3 (S.D. Fla. Jan. 29, 2002) (citing Antenor, 88 F.3d at 932-33). With these principles in mind, the undersigned will apply the eight-factor test to the instant case.

### 1.   The Nature and Degree of Siltek's Control of the Plaintiffs

"Control arises . . . when the [putative joint-employer] goes beyond general instructions . . . and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work." Layton, 686 F.3d at 1181 (quoting Aimable v. Long and Scott Farms, 20 F.3d 434, 441 (11th Cir. 1994)). "A purported employer takes an overly active role in the oversight of work "when it decides such things as (1) for whom and how many employees to hire; (2) how to design the employees' management structure; (3) when work begins each day; (4) when the laborers shall start and stop their work throughout the day; and (5) whether a laborer should be disciplined or retained." Id. (quoting Martinez-Mendoza v. Champion Int'l Corp., 340 F.3d 1200, 1209-10 (11th Cir. 2003). "When assessing the nature and degree of control, [the Court's] 'focus is more properly limited to specific indicia of control.'" Id. (quoting Aimable, 20 F.3d at 440).

Siltek argues that its control over the plaintiffs was "de minimus and abstract at most." Defendant Siltek Group, Inc.'s Motion for Summary Judgment and Memorandum

of Law (DE# 61 at 8, 11/20/14). Siltek notes that it:

> never assigned specific [p]laintiffs to specific tasks, never dictated how
> [the p]laintiffs were to reach their goals, and never involved itself in VR
> Enterprises' management structure. Siltek never communicated directly
> with [the p]laintiffs regarding the work VR Enterprises was contracted to
> perform. Siltek never instructed VR Enterprises or [Mr.] Lavastida on who
> to hire or how many workers to hire. Such decisions were solely the
> responsibility of [Mr.] Lavastida and VR Enterprises.

Id. at 8-9. Siltek further notes that although it chose the hours when the job site was

open and when it was closed each day, it never directed the specific hours the plaintiffs

worked. Id. at 9. Finally, Siltek notes it did not have the authority to make disciplinary or

retention decisions regarding the plaintiffs. Id.[26]

The plaintiffs argue that:

> Siltek's superintendent would manage the work of the subcontractors to
> make sure the work was being performed according to plan. [Sierra Depo.
> P. 13. L. 12 – P 14 L. 5]. Siltek's superintendent would instruct the
> subcontractors as to which parts of the building to work on. [Sierra Depo.
> P. 14. L. 6-12]. Siltek's foreman would direct and control the work of the
> carpenters supplied to Siltek. [Lavastida Declaration para. 5]. Siltek would
> conduct weekly meeting with all subcontractors as to the progress of the
> work and Siltek would be the one to control these meetings. [Sierra Depo.
> P. 14. L. 10-25]. Burt Villareal would check to make sure the
> subcontractors were performing their work according to the plans.
> [Villareal Depo. P. 12 L. 6-16]. Burt Villareal was on the premises the
> entire time work was being performed. [Villareal Depo. P. 12 L. 22-25].
> Subcontractors could not perform work on the site unless a Siltek
> employee was there to supervise their work. [Villareal Depo. P. 13 L. 14-
> 25]. It was Siltek's job to make sure the work performed by the
> subcontractors were done properly. [Villareal Depo. P. 20 L. 10-12]. Siltek
> was the one to determine what days of the week subcontractors could
> perform work on the project. [Villareal Depo. P. 29 L. 4-13]. Siltek always
> had to have someone on the premises supervising the work of the

---

[26] Although Siltek claims it "had the ability to ask the subcontractor to remove a
worker from the Project site if such worker posed a safety issue," Mr. Mardi's deposition
testimony makes clear that, at least in some instances, Siltek's practice was to remove
the worker from the job site first and then notify the subcontractor.

subcontractors [Marti Depo. P. 15-16]. Initially, work was not performed on the site on Saturdays, however Burt Villareal and Mike Marti were the ones to make the decision that work needed to be performed on Saturdays. [Marti Depo. P. 15 L. 10-12]. Burt Villareal[ ] would "make sure that all the subcontractors were there on time, make sure that they're running the proper schedule and that they understand that they were doing everyday." [Marti Depo. P. 27 L. 4-8]. Siltek had the authority to fire a subcontractor's worker for probable cause. [Marti Depo. P. 45 -46]. Siltek has the right to fire a subcontractor's employee [Sierra Depo. P. 42. L. 22- P. 43 L. 6].

Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment (DE# 67 at 2, 12/18/14).[27] No workers attended these meetings, only the subcontractors' supervisors. See Deposition of Michael Marti (DE# 62-4 at 35, 11/20/14).

In Layton, the Eleventh Circuit found that the first factor weighed against a finding of joint-employment where the purported joint-employer, DHL,[28] exhibited "abstract control" over the plaintiffs as opposed to engaging in an active role in the oversight of the work. Layton, 686 F.3d at 1178. The Eleventh Circuit summarized DHL's oversight of the plaintiffs' work as follows: "DHL dictated what time the packages

---

[27] The undersigned cites to the plaintiffs' reply in support of their own summary judgment motion because that is where the plaintiffs address the eight-factor test of Layton. In their response to Siltek's summary judgment motion, the plaintiffs addressed a different test from Santelices. See supra.

[28] In Layton, DHL, "a provider of shipping and logistic services," used "third-party contractors who employ[ed] couriers to deliver DHL's packages." Layton, 686 F.3d at 1173. The plaintiffs were drivers who were employed by one of those contractors "and served mainly as delivery couriers." Id. The plaintiffs asserted that DHL and the third party contractor were joint-employers and thus liable to the plaintiffs under the FLSA. Id. at 1174. The district court granted summary judgment in DHL's favor finding that it was not an employer or joint-employer of the plaintiffs. Id. at 1175. The plaintiffs appealed and the Eleventh Circuit, after applying the eight-factor test, affirmed the summary judgment ruling on the ground that DHL was not a joint-employer. Id. at 1181.

were available for pick-up each morning, thereby limiting how early [the d]rivers'

workdays could begin. Additionally, DHL occasionally had erratic pick-up orders to

which [the d]rivers had to respond, resulting in [the d]rivers working longer hours." Id.

The Eleventh Circuit referred to these examples as an "indirect type of control" which

was "more akin to the 'abstract' control present in Aimable than the type of control

exercised by an employer." Id. The Eleventh Circuit further noted that:

> DHL may have incidentally impacted [the d]rivers' working conditions, but
> . . . d[id] not find that DHL's conduct evidenced an "overly active" role in
> the oversight of [the d]rivers. **DHL had certain objectives – having its**
> **packages delivered on time, serving its customers – that [the third**
> **party contractor], and therefore [the d]rivers, were tasked with**
> **accomplishing. DHL did not involve itself with the specifics of how**
> **those goals would be reached** – it did not apportion tasks to individuals,
> specify how many individuals should be assigned to each delivery route,
> or structure the chain of command among [the d]rivers. Overall, this factor
> weigh[ed] against a finding of joint employment because DHL did not
> exert control as an employer would have.

Id. (emphasis added).

Similarly here, Siltek had certain objectives in meeting the goals of the general

contract. In meeting these goals, Siltek hired subcontractors, held weekly meetings with

representatives of these subcontractors and set a schedule for when certain

construction objectives would be met. It did not, however, assign specific workers to

certain tasks. Siltek had no involvement in VR Enterprises/the plaintiffs' management

structure. While there is evidence that Siltek set the hours during which the job site

would be open, these hours were not specifically set for VR Enterprises' workers. There

were multiple subcontractors working at the job site each day. Notably, once VR

Enterprises' workers started their work day, there is no evidence Siltek would tell them

when to start and stop work <u>throughout</u> the day. Thus, Siltek's setting of the hours during which the job site would be open <u>to all subcontractors</u> had only an incidental or indirect effect on the plaintiffs' work schedules. There is also no evidence that the plaintiffs or any of VR Enterprises' workers were disciplined or retained by Siltek's employees. While there is evidence that Siltek could fire any subcontractor's worker from the job site, especially for safety concerns, there is no evidence that Siltek could fire that worker from the subcontractor's payroll.

Although Mr. Villareal told VR Enterprises' workers what part of the building to work on and checked the blueprints to make sure that the structural work was done in accordance with the layouts for the buildings, he did not tell the plaintiffs how to do their actual job, meaning how to pour the concrete and create the walls. Mr. Lavastida's conclusory statement that Siltek would "direct and control" the plaintiffs' work, without any detail or explanation, is insufficient to create an issue of fact. <u>See</u> <u>Sellers v. Am. Broad. Co.</u>, 668 F.2d 1207, 1210 n.3 (11th Cir. 1982) ("Conclusory statements, unsubstantiated by facts in the record, will normally be insufficient to defeat a motion for summary judgment.").

In <u>Diaz v. U.S. Century Bank</u>, No. 12-21224-CIV, 2013 WL 2046548, at *6 (S.D. Fla. May 14, 2013), this Court found that the putative joint-employer, a bank, exercised only limited control over the plaintiffs even though it "set the start and ends times for both [plaintiffs]." This Court noted that the bank "largely did not direct [the p]laintiffs beyond providing them with general instructions during their time at the bank" and did not "actively and overtly involve itself in [the p]laintiffs' specific tasks on a constant basis." <u>Id.</u> Based on the facts of the instant case, the undersigned concludes that any

control Siltek had over the plaintiffs was incident or indirect and akin to that exhibited by the purported joint employers in <u>Layton</u> and <u>Diaz</u>.

### 2.     The Degree of Supervision, Direct or Indirect, of the Plaintiffs' Work

"Supervision over work includes overseeing the work and providing direction on a regular, even daily basis." <u>Tafalla v. All Fla. Dialysis Servs., Inc.</u>, No. 07-80396, 2009 WL 151159, at *7 (S.D. Fla. Jan. 21, 2009) (citing <u>Antenor</u>, 88 F.3d at 934). "Supervision can be present regardless of whether orders are communicated directly to the alleged employee or indirectly through the contractor." <u>Layton</u>, 686 F.3d at 1178-79. However, "[i]nfrequent assertions of minimal oversight do not constitute the requisite degree of supervision." <u>Id.</u> at 1179 (quoting <u>Aimable</u>, 20 F.3d at 441).

In <u>Layton</u>, the Eleventh Circuit concluded that this factor was not strongly probative of joint-employment where "DHL engaged in a limited amount of monitoring at the warehouse, but [the d]rivers were basically unsupervised while completing their most essential job functions which took up the majority of the work day – making deliveries.

Siltek argues that it:

never directly supervised [the p]laintiffs' work, nor did Siltek have direct interaction with [the p]laintiffs regarding their work. At most, Siltek's supervision of [the p]laintiffs work, if any, was indirect by virtue of the presence of Siltek's superintendent at the Project site. Any communications regarding VR Enterprises' work were between Siltek and [Mr.] Lavastida and/or a representative for VR Enterprises.

***

. . . Siltek never assigned [the p]laintiffs specific tasks, and never instructed [the p]laintiffs on which part of the work they were to do. All of those decisions rested solely with [Mr.] Lavastida and VR Enterprises.

27

> Furthermore, as the subcontract agreement made clear, VR Enterprises
> was solely responsible for providing "full time, competent supervision" on
> the Project for its employees.

Defendant Siltek Group, Inc.'s Motion for Summary Judgment and Memorandum of

Law (DE# 61 at 9-10, 11/20/14).

In addition to the facts cited by the plaintiffs in support of the first factor, <u>see</u>

<u>supra</u>, the plaintiffs note that they could not perform any work at the job site unless a

Siltek employee was present to supervise their work and Mr. Villareal "would 'make sure

that all the subcontractors were there on time, make sure that they[ were] running the

proper schedule and that they underst[oo]d [w]hat they were doing everyday.'" Plaintiffs'

Reply to Defendant's Response in Opposition to Plaintiffs' Motion for Summary

Judgment (DE# 67 at 4 12/18/14) (quoting Mr. Marti's deposition).

As with the first factor, the undersigned similarly concludes that the second

factors weighs against a finding of joint-employment status. Although Mr. Villareal

checked the blue prints, told the plaintiffs what parts of the building to work on and set

the general schedule for the project, there is no evidence that Mr. Villareal or anyone at

Siltek told the plaintiffs how to do their main job, which was to construct the structure

(the walls) of the building.

### 3. The Right, Directly or Indirectly to Hire, Fire, or Modify the Plaintiffs' Employment Conditions

#### a. Hiring

The undisputed record evidence is that Siltek had no involvement in VR

Enterprises' hiring process. It conducted no background checks on its subcontractor's

workers and had no say on which specific workers VR Enterprises hired or brought to

the job site each workday.

### b.    Firing

The plaintiffs argue that "[i]t is undisputed that Siltek had the authority to fire a subcontractor's worker . . . ." Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment (DE# 67 at 4, 12/18/14) (citing Mr. Sierra and Mr. Marti's deposition testimony). During his deposition, Mr. Sierra testified that Siltek retained the right to fire a subcontractor's worker, especially if it dealt with a safety issue. Similarly, Mr. Marti testified that Siltek could fire a subcontractor's worker for probable cause such as a safety violation or if a worker showed up intoxicated. However, Siltek could not fire a worker from a subcontractor's employment. See Deposition of Michael Marti (DE# 62-4 at 45-46, 11/20/14). Thus, while Siltek could remove VR Enterprises' workers from the job site, there is no record evidence that Siltek could fire a worker from VR Enterprises' employment.[29]

In Diaz, the plaintiffs were security guards who were assigned to work at a bank in the Doral area of Miami-Dade County. Diaz, 2013 WL 2046548 at *1. The plaintiffs argued that the bank was their joint employer and "could effectively modify their employment conditions by refusing their presence at the Doral location." Id. at *8. This Court reasoned that:

> Even if [the bank]'s unexercised right to refuse a particular officer at the Doral location constituted an ability to modify [the p]laintiffs' employment

---

[29] Mr. Sierra's deposition testimony did not specify whether the worker could be "fired" from the project or fired from VR Enterprises. Mr. Marti's deposition testimony specifically states that while a worker could be fired from the job site, Siltek could not fire that worker from the subcontractor's employment. See Deposition of Michael Marti (DE# 62-4 at 45-46, 11/20/14).

conditions, the Court finds this power to be limited. Though [the bank] could affect [the p]laintiffs' ability to work at its offices, **the bank could not modify [the p]laintiffs' employment if [the contractor] assigned them to work for another client.** [The bank]'s ability to modify [the p]laintiffs' employment conditions thus extended only as far as [the contractor]'s initial decision to assign them to the bank. **This sort of minimal involvement with the employment process does not suggest joint employment**.

Id. (emphasis added). Similarly here, Siltek's ability to "fire" the plaintiffs from the job site is evidence of minimal involvement in the employment process and not suggestive of joint employment.

### c.      Modifying Employment Conditions

The plaintiffs argue that Siltek modified their employment conditions when it determined that work needed to be done on Saturdays. See Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment (DE# 67 at 4-5, 12/18/14). Siltek maintains that "the only way in which [it] may have 'modified' [the p]laintiffs' employment conditions [wa]s by setting the hours in which the Project site would be open, and thus Siltek may have had a very minimal, indirect impact on when [the p]laintiffs could work on the Project." Defendant Siltek Group, Inc.'s Motion for Summary Judgment and Memorandum of Law (DE# 61 at 11, 11/20/14).

In Layton, the Eleventh Circuit found that "the only way in which DHL modified [the d]river's employment conditions was by making business decisions that impacted [the d]river's hours . . ." Layton, 686 F.3d at 1179. The circuit court found that "[b]ecause DHL had minimal involvement with the employment process, this factor weigh[ed] against a finding of joint employment." Id. By contrast in Antenor, the

Eleventh Circuit found that the putative joint-employer:

> dictated the workers' hours, a condition of employment, by deciding when the work was to begin, by forcing the [workers] to stop picking when prices were bad, and, during [one] season, by sending their own tomato-picking crews into fields assigned to the farmworkers, causing them to run out of work by noon.

Antenor, 88 F.3d at 935.

Here, there is no evidence that Siltek exhibited the type of control over the plaintiffs' employment conditions outlined in Antenor. Siltek's setting of the hours during which the job site would be open is not the same as modifying the plaintiffs' employment. Siltek's hours were set in accordance with their need to meet certain goals in the construction of the building. There is no record evidence that Siltek set the individual plaintiffs' work schedules. To the extent the job site hours affected the plaintiffs, it was only incidental and indirect as in Layton and Diaz. See discussion, supra.

Based on the foregoing, the undersigned concludes that the third factor weighs against a finding of joint-employment status.

**4.    The Power to Set the Plaintiffs' Pay Rates or Payment Methods**

"[P]ay rate refers not only to the amount of compensation to be paid, but includes benefits such as worker's compensation insurance and social security, as well as how these various payments are allocated. Method of payment refers to the basis upon which a worker is paid, for example, by the hour or by the piece." Antenor, 88 F.3d at 936.

The plaintiffs argue that this factor falls in their favor because "all payments

made had to be approved by both the supervisor on site as well as through Siltek's

office. The invoices submitted by VR Enterprise[s], clearly demonstrate that payment

was made based on man power supplied and not via the amount of the project that was

completed." Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiffs' Motion

for Summary Judgment (DE# 67 at 5, 12/18/14). The submission of invoices is not the

same as setting pay rates or methods of payment. In <u>Diaz</u>, for example, this Court

found no joint-employment relationship as a matter of law even though "[the contractor]

invoiced [the bank] for every hour logged by the [the plaintiffs] at the Doral location. The

bank would then pay [the contractor] for these services." 2013 WL 2046548 at *7.[30]

      Here, there is no record evidence that Siltek had any involvement in setting the

plaintiffs' hourly rates of pay. Siltek paid VR Enterprises in accordance with the

amounts submitted in the invoices and VR Enterprises was responsible for apportioning

this amount among its workers in accordance with its payroll overhead.

      In <u>Antenor</u>, the Eleventh Circuit explained that the pay rate may include benefits

such as worker's compensation insurance. <u>Antenor</u>, 88 F.3d at 936. In the instant case,

there is no evidence that Siltek provided any insurance benefits to the plaintiffs[31] and

VR Enterprises was fired (at least in part) because it failed to maintain worker's

compensation insurance for its workers. Thus, this factor weighs against a finding of

---

[30] The <u>Diaz</u> Court considered these facts in relation to the second factor. <u>Diaz</u>, 2013 WL 2046548 at *7. Nonetheless, the undersigned finds that they are also relevant to the fourth factor in light of the plaintiffs' argument that the submission of invoices is evidence of Siltek's power to set the plaintiffs' pay rates or payment methods.

[31] Mr. Sierra's belief that his insurer would provide insurance benefits in the event that a subcontractor failed to obtain insurance is a legal conclusion and insufficient to create an issue of fact.

joint-employment status.

### 5. Preparation of Payroll and Payment of the Plaintiffs' Wages

"This factor is probative of joint employment because of the likelihood that when a business undertakes to help an independent contractor prepare its payroll and pay its wages, it is likely that the contractor lacks economic substance on which the workers can solely depend." Antenor, 88 F.3d at 936.

The plaintiffs acknowledge that there is no record evidence that Siltek issued payments to the plaintiffs. See Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment (DE# 67 at 5, 12/18/14). Nonetheless, in support of this factor, the plaintiffs cite to the following testimony from Mr. Sierra's deposition: "Checks were not written out to the subcontracting employees 'unless the subcontractors were not paying the employees' and Siltek found out about it when they were making the checks . . . ." Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment (DE# 67 at 5, 12/18/14) (quoting Deposition of Rene Sierra (DE# 62-2 at 19, 11/20/14)). When read in context, Mr. Sierra's deposition testimony clearly shows that this practice was employed only on Davis-Beacon or "federal jobs" and the Cutler Bay Project was not a "federal job." See Deposition of Rene Sierra (DE# 62-2 at 19, 24, 11/20/14).

The plaintiffs also note that "payment to [the p]laintiffs was dependent on Siltek approving the invoices submitted by VR Enterprise[s]." Id. This argument is unpersuasive for the reasons discussed in the preceding factor. See supra. If the Court were to accept this argument, then this factor would be meaningless. On some level,

every business is dependent on its customers paying its invoices in order to meet its overhead including payroll obligations.

Having thoroughly reviewed the record, the undersigned finds no evidence of Siltek playing any role in preparing VR Enterprises' payroll or in paying the plaintiffs' wages. Unlike the plaintiffs, Siltek's own employees filled out time sheets which they would sign and submit to Siltek's offices for payroll purposes. These time sheets reflected the days of the week and the hours worked by each Siltek employee. Siltek maintained records of these time sheets. There is no evidence that the plaintiffs ever submitted time sheets to Siltek.[32]

Thus, this factor weighs against a finding of a joint-employment relationship.

### 6.      Ownership of the Facilities Where the Work Occurred

"Ownership is relevant because a landowner is thought to have some knowledge of and control over what happens on his land." Layton, 686 F.3d at 1180. It "is also relevant as an indicator of economic independence." Id.; see also Antenor, 88 F.3d at 936-37 (stating that "[t]his element is probative of joint-employment status for the obvious reason that without the land, the worker might not have work, and because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors").

Siltek notes that the property where the work took place was owned by a non-party and Siltek did not lease that property from the owner. "Siltek's management of the

---

[32] The sign-in sheet posted at the job site was signed by every subcontractors' worker and was not used by Siltek for payroll purposes.

Project site was limited to general oversight of various subcontractors to ensure that work was being completed on schedule." Defendant Siltek Group, Inc.'s Motion for Summary Judgment and Memorandum of Law (DE# 61 at 12, 11/20/14). The plaintiffs maintain that "the overwhelming evidence demonstrates that Siltek controlled the worksite as subcontractors could not perform work on the site unless a Siltek employee was there to supervise their work." Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment (DE# 67 at 6, 12/18/14).

Where the job site is owned by a non-party, this Court has reached different conclusions as to the significance of this factor in the joint-employer analysis. For instance, in Tafalla v. All Fla. Dialysis Servs., Inc., No. 07-80396, 2009 WL 151159, at *8 (S.D. Fla. Jan. 21, 2009) this Court found that the sixth factor did not support a finding of joint-employment where the work took place at a facility owned by a nonparty, even though "the contract between [the facility owner] and [the putative joint-employer] gave [the putative joint-employer] the right to operate the . . . unit." By contrast, in Diaz, this Court found that although the putative employer bank did not own the premises "it certainly exercised a considerable amount of control over its workplace through its lease." Diaz, 2013 WL 2046548, at *9. The Court concluded that this factor "may weigh somewhat in favor of a joint employment relationship." Id.

When analyzing the ownership factor, "it is necessary to view this fact in light of all of the evidence in [the] case." Cruz-Lovo v. Ryder Sys., Inc., 298 F. Supp. 2d 1248, 1258 (S.D. Fla. 2003), aff'd, 2003 WL 2315011 (11th Cir. Nov. 5, 2003) (per curiam). In

Cruz-Lovo,[33] this Court analyzed the purported joint-employment relationship between a credit union and the company it served (Ryder). This Court noted that the ownership factor favored neither party even though the company was the owner of the space it leased to the credit union:

> In this case, Ryder concedes that it owns the facilities which house [the] Credit Union's offices. Viewing this fact in a vacuum, this factor appears to favor [the p]laintiff. However, it is necessary to view this fact in light of all of the evidence in this case. First, it is important to look at the nature of [the] Credit Union's business. As stated earlier, [the] Credit Union provides banking services to Ryder's employees. Common sense dictates that [the] Credit Union location would be within Ryder's facilities in order to serve its members. Further, it is undisputed that Ryder <u>rents</u> this office space from Ryder. This fact negates the implication that Credit Union is economically dependent on Ryder. On whole, this factor favors neither Defendants' nor Plaintiff's position.

Id. (emphasis in original).

Similarly here, the undersigned concludes that this factor favors neither the plaintiffs nor Siltek. Siltek is a general contractor. It is in the business of constructing buildings. By its very nature, the construction work must take place on the premises where the building is being constructed. Typically, the general contractor does not own the land on which the construction work takes place. VR Enterprises is a subcontractor. It supplies carpenters to construct large, concrete structural surfaces including walls. As a practical matter, this work must always be done on the premises where the building is being constructed. Thus, the ownership of the construction site where the work took place is a neutral factor in the instant case.

---

[33] Cruz-Lovo concerned claims under the Family Medical Leave Act ("FMLA"). Both the FLSA and the FMLA use the same definition of the word "employ." As such, the Cruz-Lovo Court relied on Antenor in determining whether a joint-employment relationship existed. See Cruz-Lovo, 298 F. Supp. 2d at 1251, 1255.

7.      **The Plaintiffs' Performance of a Speciality Job Integral to the Business**

"This factor is probative of joint employment because a worker who performs a routine task that is a normal and integral phase of the [putative joint-employer]'s production is likely to be dependent on the [putative joint-employer]'s overall production process." Antenor, 88 F.3d at 937. In Layton, the Eleventh Circuit found that "this factor d[id] not strongly support a conclusion that a joint-employment relationship exist[ed], even though the delivery of packages was a "crucial task for DHL," because: "[the d]rivers performed most of their work away from DHL's facilities and supervision; they did not work side-by-side with other DHL employees[; the d]rivers . . . operated vehicles not owned by DHL, and they were not contractually restricted from using those vehicles to serve other companies needing delivery services." Layton, 686 F.3d at 1180.

With respect to this factor, Siltek argues that:

> the [p]laintiffs work here was not dependent on Siltek's overall "production" process. Essentially, [the p]laintiffs were performing macro-level tasks for VR Enterprises to fulfill the subcontracted shell work. Once VR Enterprises' scope of work was complete, VR Enterprises and [the p]laintiffs would no longer be working at the Project. . . . [The p]laintiffs could move on to work other Projects for VR Enterprises. [The p]laintiffs were not assigned with specific tasks, they did not perform specialty work or work at a particular position, and a construction site is not analogous to a production line. Many trades are present at a construction site on any given day.

Defendant Siltek Group, Inc.'s Motion for Summary Judgment and Memorandum of Law (DE# 61 at 13, 11/20/14).

The plaintiffs argue that because "[Siltek] is in the business of constructing buildings from scratch, and [the p]laintiffs were hired to construct the frame or structure

37

of the building, it is fair to say that the service rendered by [the p]laintiffs was an essential part or integral part of Siltek's business." Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment (DE# 67 at 6, 12/18/14).

The seventh factor weighs in favor of finding joint-employment status. Siltek is in the business of constructing apartment and commercial buildings. On the Cutler Bay Project, Siltek was hired to construct a four story, 101 unit building from the ground up. The plaintiffs were "carpenters" who performed the structural work – forming, placing the reinforcing steel and pouring the concrete – for that building. As such, the plaintiffs' work was integral to Siltek's business. Had the plaintiffs been allowed to complete the structural work, other subcontractors would have come in, such as the dry wall installers, and finished the building. See Deposition of Michael Marti (DE# 62-4 at 40-41, 11/20/14) (stating that once the structure was finished, then the dry wall side of it would come in).

### 8. Siltek's Relative Investment in Equipment and Facilities

"Finally, [the Court] must consider the relative degree of investment in equipment and facilities by the independent contractor on the one hand, and the putative employer on the other." Antenor, 88 F.3d at 937. The Eleventh Circuit "consider[s] this factor because workers are more likely to be economically dependent on the person who supplies the equipment or the facilities." Layton, 686 F.3d at 1181. In Layton, the Eleventh Circuit concluded that this last factor did not aid in its joint-employment inquiry because both DHL and the third party contractor made "significant investments in

facilities and equipment." Id.

Here, there is no record evidence that VR Enterprises made any investment in the facilities and/or equipment of the Cutler Bay Project. In the instant case, Siltek provided all of the building material which exceeded one million dollars. Although Siltek did not own the crane used at the job site, Siltek made the crane and the forklift[34] available for use by VR Enterprises' workers.

Siltek relies heavily on language of the subcontract, noting that:

VR Enterprises agreed that it would be the solely responsible for the accessories until they are returned, and that VR Enterprises would be solely responsible for the cost of any shortages of the rented equipment. Pursuant to the contract, VR Enterprises was required to furnish "all labor, supervision, services, material, equipment, tools, insurance, permits, all applicable taxes and all other items necessary to perform the concrete shell work . . ." and "provide temporary facilities, items, or utilities as may be required for its work on the Project."

Defendant Siltek Group, Inc.'s Motion for Summary Judgment and Memorandum of Law (DE# 61 at 13, 11/20/14). However, the FLSA joint-employment "inquiry is not governed by the 'label' put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether 'the work done, in its essence, follows the usual path of an employee." Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1311 (11th Cir. 2013) (quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 729 (1947)); Beck v. Boce Grp. L.C., 391 F. Supp. 2d 1183, 1190 (S.D. Fla. 2005) (stating that "the economic realities test requires this Court to consider and evaluate the **employment relationship in practice**. Thus, **reliance on contractual provisions without other**

---

[34] There is no record evidence on whether Siltek owned the forklift used at the job site. The record evidence is that Siltek supplied the forklift. See Deposition of Michael Marti (DE# 62-4 at 9, 11/20/14).

**evidence** indicating that the employer possessed the right to hire, fire, or modify the conditions of employment **in practice is unavailing**.") (emphasis added). Siltek presents no record evidence of this contractual provision "in practice." Thus, the subcontract agreement sheds little light on the issue of economic dependence.

Siltek also notes that "VR Enterprises and/or the [p]laintiffs were responsible for supplying their own tools for the work." Defendant Siltek Group, Inc.'s Motion for Summary Judgment and Memorandum of Law (DE# 61 at 14, 11/20/14). Siltek provides no record evidence of what tools were supplied by VR Enterprises/the plaintiffs[35] or the cost of those tools. In any event, it seems highly unlikely that the investment in these tools exceeded Siltek's investment of over one million dollars in the materials.

Based on the foregoing, the undersigned concludes that this factor weighs in favor of finding a joint-employment relationship. Nonetheless, this factor is not dispositive of the issue. "[N]o one factor is determinative" and "the weight of each factor depends on the light it sheds on the [ ]workers' economic dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case." <u>Layton</u>, 686 F.3d at 1177 (second alteration in original).

### 9. Additional Consideration

Beyond the eight factors, Siltek asks the Court to take into account the fact that Siltek maintained no employment records for the plaintiffs. <u>See</u> Defendant Siltek Group,

---

[35] The undersigned notes that the relevant inquiry for this factor is the investment made by the purported joint employers, not the plaintiffs' investment. <u>See</u> <u>Layton</u>, 686 F.3d at 1181 (comparing the contractor's investment with DHL's investment).

Inc.'s Motion for Summary Judgment and Memorandum of Law (DE# 61 at 14, 11/20/14) (citing <u>Villareal v. Woodman</u>, 113 F.3d 202, 205 (11th Cir. 1997)). The Court finds that Siltek's lack of employment records for the plaintiffs is suggestive of a non-joint-employment relationship. <u>See</u> <u>Diaz</u>, 2013 WL 2046548, at *10 (noting that the putative joint-employer's failure to maintain employment records of the plaintiffs was a consideration which weighed against the finding of joint-employment).

      Siltek also asks that the Court rely on the language of the subcontract and its indemnity provision as probative evidence that no employment relationship existed between Siltek and the plaintiffs. <u>See</u> Defendant Siltek Group, Inc.'s Motion for Summary Judgment and Memorandum of Law (DE# 61 at 14, 11/20/14). Again, reliance on contractual language without evidence of how that language was implemented by the parties is not helpful to the Court's inquiry. <u>See</u> <u>Beck</u>, 391 F. Supp. 2d at 1190.

      The existence of a joint-employment relationship under the FLSA is a matter of law. <u>Antenor</u>, 88 F.3d at 929. Considering all the factors, collectively and qualitatively, the undersigned concludes that the plaintiffs were not economically dependent on Siltek. Although factors seven and eight weigh in favor of the plaintiffs, the totality of the evidence shows that no joint-employment relationship existed between Siltek and the plaintiffs. <u>See</u> <u>Tafalla</u>, 2009 WL 151159, at *9 (granting summary judgment in favor of the purported joint-employer even though "[the purported joint-employer] invested in the equipment for the [plaintiffs] to perform their jobs, and those jobs were integral to the business. . . ."). Accordingly, the Defendant Siltek Group, Inc.'s Motion for Summary

Judgment and Memorandum of Law (DE# 61, 11/20/14) is **GRANTED**.

**B.    Plaintiffs' Motion for Summary Judgment (DE# 62)**

The plaintiffs seek summary judgment in their favor on three grounds: (1) that Siltek was a joint-employer of the plaintiffs; (2) that Siltek was the plaintiff's employer and (3) that enterprise coverage is met in this case. With respect to the first issue, the undersigned has already determined that Siltek was not the plaintiffs' joint-employer. The undersigned also finds that Siltek was not the plaintiffs' employer. See Hurtado v. Raly Dev., Inc., No. 11-24476-CIV, 2012 WL 3687488, at *12 (S.D. Fla. Aug. 27, 2012) (noting that "to be considered a 'joint employer,' an entity must first be an employer.") (citing 29 C.F.R. § 791.2(a)). The undersigned's ruling renders moot the issue of enterprise coverage. Accordingly, the plaintiffs' request for summary judgment is **DENIED** in its entirety.

**CONCLUSION**

Based on the foregoing, it is

ORDERED AND ADJUDGED that the Defendant Siltek Group, Inc.'s Motion for Summary Judgment and Memorandum of Law (DE# 61, 11/20/14) is **GRANTED** and the Plaintiffs' Motion for Summary Judgment (DE# 62, 11/20/14) is **DENIED**.

Pursuant to Rule 58(a) of the Federal Rules of Civil Procedure, the Court will enter its judgment in a separate Order. All pretrial hearings and deadlines are CANCELLED.

DONE AND ORDERED, in Chambers, at Miami, Florida, this **5th** day of February, 2015.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
All counsel of record

42